**SO ORDERED: December 21, 2015.**



**James M. Carr**
**United States Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| EDWARD LEE CALVERT, | ) | Case No. 13-13079-JMC-7A |
| | ) | |
| Debtor. | ) | |
| ———————————————————— | ) | |
| | ) | |
| NATIONAL LABOR RELATIONS BOARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. 15-50001 |
| | ) | |
| EDWARD LEE CALVERT, | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS MATTER came before the Court for a bench trial on September 23, 2015.  Plaintiff

National Labor Relations Board ("NLRB") appeared by counsel William R. Warwick, III and

Dalford Dean Owens, Jr.  Defendant Edward Lee Calvert ("Calvert") appeared *pro se*.

The Court, having reviewed the evidence presented at trial, the *Joint Stipulation of Facts* filed by Calvert and the NLRB on September 16, 2015 (Docket No. 46), the *Pre-Trial Brief of the National Labor Relations Board* filed on September 17, 2015 (Docket No. 47) (the "NLRB's Trial Brief"), the *Pre-Trial Brief of Defendant, Edward Lee Calvert, Pro Se* filed on September 18, 2015 (Docket No. 49), and the other matters of record in this adversary proceeding; having heard the presentations at trial; and being otherwise duly advised, now enters the following findings of fact and conclusions of law as required by Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052, consistent with its statements on the record at the conclusion of the trial.

### Findings of Fact

Calvert and the NLRB have jointly stipulated to the following facts:[1]

1.      On July 29, 2005 the National Labor Relations Board issued a Decision and Order reported at *E.L.C. Elec., Inc.,* 344 NLRB 1200 (2005).

2.      On September 28, 2006 the National Labor Relations Board issued a Decision and Order reported at *E.L.C. Elec., Inc.*, 348 NLRB 301 (2006).

3.      On November 8, 2008 the National Labor Relations Board issued a Decision and Order reported at *E.L.C. Elec., Inc., & Its Alter Ego &/or Successor Midwest Elec. & Retail Contractors, Inc., d/b/a MERC, Inc., & Asset Mgmt. Partners, Inc., A Single Integrated Enter. & Single Employer, & Edward L. Calvert, Individually*, 359 NLRB No. 20 (Nov. 8, 2012).

4.      On June 20, 2013, the Seventh Circuit issued a judgment, which it amended on July 23, 2013, enforcing the NLRB's 2012 order, in case *National Labor Relations Board v. E.L.C. Electric, Inc., et al.* 7th Cir. No. 13-1952.

---

[1]      Except where noted by brackets, these stipulated facts (findings 1 through 9) are included verbatim, with no adjustment to account for typographical errors or terms defined elsewhere herein.

5.      On January 28, 2014, in connection with this bankruptcy [case], Edward Calvert testified at the first creditor meeting.

6.      On April 24, 2014, in connection with this bankruptcy [case], and pursuant to Rule 2004, Edward Calvert was deposed by an attorney of the of the National Labor Relations Board.

7.      On August 14, 2014, in connection with this bankruptcy [case], and pursuant to Rule 2004, Edward Calvert was deposed by an attorney of the of the National Labor Relations Board.

8.      On December 9, 2014, in connection with this bankruptcy [case], and pursuant to Rule 2004, Edward Calvert was deposed by an attorney of the of the National Labor Relations Board.

9.      On November 19, 2012, in relation to a prejudgment writ of garnishment proceeding in United States District Court for the Southern District of Indiana, Edward Calvert was deposed by an attorney of the National Labor Relations Board.

The Court makes the following additional findings of fact:

10.      On August or September 26, 2002,[2] an election (the "Election") was held in a unit of electricians employed by E.L.C. Electric, Inc. (the "Company"), of which Calvert was owner and president.

        a.      Prior to the Election, Calvert knew that certain employees of the Company were trying to organize.

---

[2]      The testimony of Calvert (elicited by leading question) and the July 29, 2005 decision of the NLRB set forth different dates for the conduct of the Election.

b.      Prior to the Election, Calvert knew a bargaining unit would be delineated, encompassing the employees of the Company who would be eligible to vote in the Election. Calvert knew that supervisors and temporary employees could not vote in the Election.

c.      Prior to the Election, Calvert campaigned against the union, which he understood was his right, because he wanted the Company to be union-free.  Calvert sent at least two letters to Company employees explaining why he wanted the Company to remain union-free.

d.      At the time of the Election, Calvert knew that federal law gave the employees the right to try to organize a union at the Company.

11.     The union lost the Election.

12.     The union filed objections to the Election.  Pursuant to the charges filed by the union, the NLRB issued a complaint alleging that the Company had violated § 8(a)(1) and (3) of the National Labor Relations Act ("NLRA").  On April 7, 2004, the administrative law judge (the "ALJ") issued a decision that the Company had violated § 8(a)(1) and (3) of the NLRA.  On July 29, 2005, the NLRB affirmed the ALJ's rulings, findings and conclusions as modified, adopted the recommended Order as modified, and adopted the ALJ's recommendation that the Election be set aside and a new election held.

a.      Calvert understood that some of the employees who had left the Company based on the Company's violations of the NLRA and were then working for union contractors would be included in the bargaining unit for the second election.

13.     Other remedies were also ordered, including back pay awards, with respect to the Company's violations of the NLRA.  By Supplemental Decision and Order dated November 8, 2012, the NLRB affirmed the ALJ's December 20, 2011 rulings, findings and conclusions, adopted the recommended order, and ordered the Company, its alter ego and successor Midwest

Electric & Retail Contractors, Inc., d/b/a MERC, Inc., its alter ego, Asset Management Partners, Inc., and Calvert, their officers, agents, successors and assigns, to pay $437,427 plus interest to 16 individuals, an amount that was stipulated to by Calvert.

14.     On or about March 14, 2003, well before the NLRB's decision to set aside the Election and hold a new election but apparently after the NLRB issued on December 23, 2002 a report on challenged ballots and objections, order consolidating cases, order directing hearing, and notice of hearing, the Company promoted some employees in the bargaining unit to management positions and laid off 13 employees in the bargaining unit.  (Three employees had been laid off earlier in 2003.)  The Company offered to assist the laid-off employees with transitioning to a labor provider.

      a.     Calvert understood, by virtue of the layoffs, that the Company no longer had certain obligations with respect to the former employees, such as the Company was not obligated to pay them or provide various benefits such as health insurance, vacation pay, holiday pay, or 401(k) matching contributions if available.

      b.     Calvert understood, by virtue of the layoffs, that the Company had no "rank-and-file" employees who could form a bargaining unit to organize a union.

      c.     When asked if Calvert believed there would be a union going forward, he answered that he did not know.

15.     Calvert testified that the Company laid off the employees to save money associated with common wage project audits.

      a.     At the time, the Company was working on several common wage (also called prevailing wage) projects such as schools and hospitals.  At some point, it seemed to Calvert that the Indiana Department of Labor was auditing the Company on each such project.

The audit process cost the Company money and manpower and would "inevitably" (according to Calvert) find a problem, such as the Company did not pay the right wage rates or benefits because the employees were wrongly classified by job type.  Because of this difficulty, the Company chose to use temporary help through labor providers.

        b.     Under this new model, the Company would negotiate a rate with the labor provider which would include wages, benefits, state and federal taxes, insurance, etc., and the labor provider, not the Company, would be responsible for the Indiana Department of Labor audit on any future common wage project.  According to Calvert, this decision "saved the company a ton of money."

        c.     The Company sent a letter dated March 7, 2003 explaining the transition to each of the Company's employees.

        d.     The NLRB presented no evidence to contradict Calvert's testimony.

16.     On at least two occasions during the trial, counsel for the NLRB, on its direct examination of Calvert, affirmatively declined to question Calvert's intent:

> I want to move ahead now to the spring of 2003 and I'm going to ask you some questions about the lay-off of employees. And I want to be clear, **I'm not asking you why you did it**. I just want to get some facts into the record about what happened.  Transcript, 33:9-13 (emphasis added).

> Mr. Calvert, that actually didn't answer my question. **My question was not what your mindset was**. It was, at the time that you eliminate all of these bargaining unit employees, there was not a possibility there could be a union election -- .  Transcript, 37:2-5 (emphasis added).

17.     The only exchange on the NLRB's direct examination of Calvert regarding intent was as follows:

> Q So at the time you laid all these employees off, you thought there would not -- there would no longer be a union election.

> A I didn't have that in my mind.

THE COURT: Say that again, sir. What did you just say?

THE WITNESS: I said I did not have that in my mind.

THE COURT: Did not have that in your mind.

THE WITNESS: No.

Q Mr. Calvert, that actually didn't answer my question. My question was not what your mindset was. It was, at the time that you eliminate all of these bargaining unit employees, there was not a possibility there could be a union election --

A I'd say probably no.

Q -- because that was your belief.

A It wasn't my belief.

Q I know you're not -- no. Well --

A Are you asking me for my belief?

Q Yeah.

A I didn't say that was my belief. I just said I didn't lay them off for that reason. You're trying to get my belief to say that that's why I laid the people off, because so I wouldn't have a union. That was not my intent.

Q But you did transfer 13 employees to temporary --

A No, sir. I did not transfer them.

Q But you laid them off.

A I laid them off.

Q And you promoted the employees you retained to supervisor.

A Whatever the record says, I don't remember at this time exactly who even I promoted or why they were promoted. But it was probably a combination of my thoughts, Kevin Passman's thoughts of who to keep and who not to keep.

Q Okay.

THE COURT: Kevin Passman -- how do we spell that name?

THE WITNESS: P-A-S-S-M-A-N.

THE COURT: P-A-S-S --

THE WITNESS: -S-S-M-A-N.

THE COURT: -- M-A -- Passman?

THE WITNESS: Yeah. He was the vice president of ELC Electric, that had been --

THE COURT: All right.

THE WITNESS: -- with me some 20-some years.

THE COURT: All right.

Q So you didn't believe there would be a union election going forward, not that, that was your motivation. Now, please, to be clear, you did not believe there would be a union going forward.

A I didn't know.

Q But you knew you had no bargaining unit employees.

A Some time, I may have hired somebody else.

Q But at that time, you had no bargaining unit employees.

A At that time, when I laid everybody off, I did not have anyone that would fit the description of a bargaining employee.

Q Okay. Thank you, Mr. Calvert. …

Transcript, 36:17-38:23.

18.    A second election was not held.

19.    On or about December 17, 2004, Debtor signed a letter to the Company's employees outlining changes to its benefit programs effective January 1, 2005.  The letter cited the Company's "difficult financial times" as a justification, including "harassment from the IBEW union and their counterparts the NLRB".

20.    On or about March 25, 2006, the Company closed.

21.    On December 19, 2013 (the "Petition Date"), Calvert filed a voluntary petition under chapter 7 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"),[3] his schedules and statement of financial affairs.

22.    Of the $300,247.26 scheduled as the total value of Calvert's personal property, $274,000 was accounts receivable with the account debtor being Calvert's son, Kevin Calvert ("Kevin").  Calvert testified that $274,000 represents one-half of the amount he and his wife loaned to Kevin, and that Kevin owed another $274,000 to Calvert's wife.

a.    Calvert and/or his wife loaned Kevin more than $548,000[4] during 2008, 2009 and 2010.  Calvert testified at trial that he and his wife loaned Kevin money starting in 2006 when Kevin was without a job and running through 2010 or 2011.  Calvert testified that there were or should have been promissory notes for each loan showing the amount of the loan, the date of the loan, and the terms of the loan, signed by Kevin and him, but that the folder he kept of the original promissory notes was lost.

b.    This trial testimony contradicted three different amounts – approximately $340,000 between January 1, 2009 and August 12, 2012, $376,000, and $318,658 – that Calvert testified he and his wife loaned to Kevin during an August 14, 2004 deposition.

c.    Calvert has not produced the signed promissory notes to the chapter 7 trustee of Calvert's bankruptcy estate (the "Trustee") or the NLRB.  Calvert printed from his computer copies (unsigned) of the notes and gave them to the NLRB and/or Trustee.

---

[3]    All statutory references hereinafter are to the Bankruptcy Code unless otherwise noted.

[4]    Calvert testified that a portion of this amount is attributable to Calvert and/or his wife reimbursing Kevin for health insurance that Kevin provided for Calvert and his wife.

d.      On February 13, 2015, Trustee initiated an adversary proceeding captioned *Petr v. Calvert*, Adversary Proceeding No. 15-50034, against Kevin seeking a judgment of more than $548,000 plus interest relating to Calvert's loans to Kevin, which Trustee alleged, among other things, were fraudulent transfers.  Trustee's allegations were resolved via a settlement that the Court approved on July 6, 2015 (Bankruptcy Case Docket No. 157).  Pursuant to the terms of the settlement, Kevin will pay $150,000 to Calvert's bankruptcy estate over the course of two years.  In the event of a default in payment, Trustee would submit to the Court an Agreed Judgment in the amount of $300,000.  Trustee represented to the Court that he believes, (a) "that the proposed settlement is fair and equitable under the circumstances by avoiding uncertain, lengthy and costly litigation which, if successful, would be followed by protracted and expensive proceedings to recover any judgment amount against Kevin"; (b) "in the reasonable exercise of his business judgment, that the proposed settlement is in the best interests of the estate and the creditors"; and (c) that the settlement "represents a fair and appropriate compromise in light of the factors and considerations presented."  (*See* Bankruptcy Case Docket No. 156, ¶¶ 7, 9, 10.)  No party in interest, including the NLRB, filed a timely objection to the settlement motion.

23.      On January 28, 2014, at the § 341 first meeting of creditors, Calvert testified that his only income was derived from social security and rental income.  His responses to item 1 (income from employment or operation of business) and item 2 (income other than from employment or operation of business) on the statement of financial affairs showed social security, rental income, tax refunds, an IRA distribution, and a loan against a life insurance policy.

a.      His 2013 tax return shows business income of $17,072, which Calvert testified was from his consulting activities.  Calvert worked, issued invoices and got paid in 2013 and 2014 for consulting work that he performed separate and apart from the listed sources of income.

b.      Calvert issued consulting invoices under the name "Express Consulting" but did not list Express Consulting in response to item 18 (nature, location and name of business) on the statement of financial affairs.  Calvert further testified that "Express Consulting" was a business his son had incorporated, and Calvert chose the wrong name.

c.      Calvert testified that he does not consider the consulting income to be "business" income because he did not formally establish a company with the State of Indiana, e.g., he did not receive a certificate, he was not granted a license, he did not advertise, and he did not have a telephone line, stationery, accounting system, business cards and so forth.  Calvert testified at trial that these projects were referred to him by long-time friends.

24.      After the NLRB obtained a Court order, Calvert's account at Fifth Third Bank appears to have been garnished.  Thereafter, Calvert closed such account and began to use his wife's account (the "Account") at Chase Bank.  Calvert's income, including payments for Calvert's consulting work, and his wife's income were then deposited into the Account.

a.      On Schedule B, item 2 (checking, savings or other financial accounts …), Calvert did not list his interest in the Account.

b.      Calvert testified that the Account was not included because it is his wife's account and she is not part of the bankruptcy case.

25.      Calvert received $10,000 on or about December 9, 2013 (10 days prior to the Petition Date) as payment for his consulting services, which was not reflected in the schedules or

statement of financial affairs.  Calvert testified that he had spent such money pre-petition to pay

bills.  Calvert testified at trial that he thought what he had (in terms of assets) on the Petition

Date was all that had to be included in the bankruptcy papers.

26.     As of September 23, 2015, after applying two involuntary payments against the

amounts owed, the outstanding amount of the debt owed by Calvert is $458,249.00 plus excess

tax amounts to account for such liability that the individuals to whom the back pay is owed

would incur by receiving the back pay and interest in a lump sum.

## Conclusions of Law

The Court makes the following conclusions of law:

1.     Any finding of fact above will also be a conclusion of law, and any conclusion of

law will also be a finding of fact to support the judgment of the Court.

2.     This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1334 and 157.

3.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2)(I).

4.     Venue is proper in this matter pursuant to 28 U.S.C. §§ 1408 and 1409.

5.     As more fully described in the *Entry on Motion for Summary Judgment* entered

September 1, 2015 (Docket No. 39), the claims against Calvert have been liquidated in the

NLRB proceedings (with Calvert's and his counsel's participation) and the Court will give

preclusive effect to the amount of the debt.

### § 523(a)(6)

6.     Exceptions to discharge under § 523 "are to be [construed] strictly against a

creditor and liberally in favor of the debtor."  *Goldberg Sec., Inc. v. Scarlata (In re Scarlata)*,

979 F.2d 521, 524 (7th Cir. 1992) (quoting *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir. 1985)).

"The burden is on the objecting creditor to prove exceptions to discharge." *Id.* (citation omitted). The burden of proof required is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

7.      A debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" is excepted from discharge pursuant to § 523(a)(6). "Bankruptcy courts in [the Seventh Circuit] have focused on three points: (1) an injury caused by the debtor (2) willfully and (3) maliciously." *First Weber Group, Inc. v. Horsfall*, 738 F.3d 767, 774 (7th Cir. 2013) (citations omitted).

8.      Injury "is understood to mean a 'violation of another's legal right, for which the law provides a remedy.' The injury need not have been suffered directly by the creditor asserting the claim. The creditor's claim must, however, derive from the other's injury." *Id.* (internal citations omitted).

9.      "Willfulness requires 'a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury.' " *Id.* (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) (emphasis in original)). " 'Willfulness' can be found either if the 'debtor's motive was to inflict the injury, or the debtor's act was substantially certain to result in injury.' " *Id.* (quotation omitted).

10.     Maliciousness requires the debtor to act "in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994) (quotation omitted). The Seventh Circuit reaffirmed its definition of maliciousness from *Thirtyacre* as good law. *Horsfall*, 738 F.3d at 774-75.

11.     The NLRB asserted (and has the burden of proving) that "Calvert willfully and maliciously injured his employees when he terminated them for exercising rights guaranteed to

them by the National Labor Relations Act, and thereafter arranged to employ them indirectly, through labor brokers, so that he could avail himself of their skills without having to contend with their exercising their federally protected rights under the National Labor Relations Act." NLRB's Trial Brief, p. 6.  Calvert disagrees.

12.     With respect to an "injury," it is established, based on Calvert's testimony, that his decision to promote or lay off all of the Company's bargaining-unit employees prevented them from exercising their legal right to organize or not to organize at the Company under the NLRA.

13.     Likewise, with respect to "willful," it is established, based on Calvert's testimony, that he understood that there were no bargaining-unit employees who could exercise their legal right to organize or not to organize at the Company once they were laid off or promoted.  This is sufficient to establish willfulness as described in *Horsfall* because "[Calvert's] act was substantially certain to result in injury."

14.     With regard to maliciousness, the Court is contending with two competing reasons for the layoffs/promotions:  (i) the NLRB's position that Calvert acted "in conscious disregard" of the organization rights of the Company's employees; or (ii) Calvert's "just cause or excuse" to save the Company money.

        a.     Calvert testified that he switched to temporary help from labor providers to avoid costly audits by the Indiana Department of Labor on common wage projects.  The NLRB presented no evidence (testimony or documentary) refuting Calvert's testimony (a) that the Company had been audited, (b) that the Company incurred costs responding to those audits, or (c) that the audits revealed issues.

b.      The record with respect to what Calvert knew at the time he made the decision to layoff/promote the employees is somewhat unclear. The Election, which the union lost, was conducted during the fall before Calvert made the decision. Calvert apparently knew before he made the decision that the union had challenged the Election. However, Calvert did not know that a second election would be ordered because the ALJ's decision, and the affirmance thereof by the NLRB, were not issued until 2004 and 2005, respectively. Calvert's testimony revealed uncertainty:

> Q So you didn't believe there would be a union election going forward, not that, that was your motivation. Now, please, to be clear, you did not believe there would be a union going forward.

> A I didn't know.

(Transcript, 38:13-17). This appears to be substantiated by the fact that the ALJ's and the NLRB's decisions were not issued until more than one year and two years, respectively, thereafter. The NLRB did not present evidence from which the Court can conclude that, at the time the decision was made, it was more likely than not that Calvert consciously disregarded the organization rights of the Company's employees when Calvert presented uncontroverted evidence of a legitimate business reason for the layoffs/promotions.

15.      Therefore, because the Court must construe exceptions to discharge strictly against the NLRB and liberally in favor of Calvert, the Court concludes that the NLRB did not prove by a preponderance of the evidence that Calvert acted maliciously. The debt owed by Calvert is NOT excepted from discharge pursuant to § 523(a)(6).

### § 727(a)(3) and (4)

16.      Section 727 provides, in relevant part:

(a) The court shall grant the debtor a discharge, unless –

(3)  the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4)  the debtor knowingly and fraudulently, in or in connection with the case –

(A)  made a false oath or account;
(B)  presented or used a false claim;
(C)  gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or
(D)  withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs; … .

17.    "Consistent with the 'fresh start' policy underlying the Code, these [§ 727(a)] exceptions to discharge should be construed strictly against the creditor and liberally in favor of the debtor.  It is also important, however, to recognize that a discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor."  *Matter of Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996) (internal citations omitted).  "The denial of discharge is a harsh remedy to be reserved for a truly pernicious debtor."  *Soft Sheen Prods., Inc. v. Johnson (In re Johnson),* 98 B.R. 359, 367 (Bankr. N.D. Ill. 1988) (citation omitted).  The grounds for denial of discharge under § 727(a) must be established by a preponderance of the evidence. *Peterson v. Scott (In re Scott),* 172 F.3d 959, 966–67 (7th Cir. 1999).

§ 727(a)(3)

18.    "The purpose of § 727(a)(3) is 'to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs.' "  *Id.* at 969 (quoting *Cox v. Lansdowne (In re Cox)*, 904 F.2d 1399, 1401 (9th Cir. 1990)).  As a precondition to discharge, debtors are required to "produce records which provide creditors 'with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy

for a reasonable period past to present.' " *Juzwiak*, 89 F.3d at 427 (quotations omitted). "Records need not be kept in any special manner, nor is there any rigid standard of perfection in record-keeping mandated by § 727(a)(3).  On the other hand, courts and creditors should not be required to speculate as to the financial history or condition of the debtor, nor should they be compelled to reconstruct the debtor's affairs." *Id.* at 428 (internal citations omitted).  Intent is not a requisite element for denying a discharge under § 727(a)(3). *Scott,* 172 F.3d at 969.

19.     With respect to § 727(a)(3), the NLRB's sole focus is Calvert's failure to produce signed promissory notes documenting Calvert's and his wife's loans to Kevin, which are, according to the NLRB, absolutely necessary for it to "figure out exactly how much [Calvert] loaned his son and the precise character of these loans … ."  Transcript, 91:16-19.  Calvert testified that he lost the folder containing the original promissory notes, but he produced unsigned copies of the promissory notes that he printed from his computer.

20.     As noted in Conclusion of Law § 18 above, Calvert's presentation of his financial affairs need not be perfect, but it had to provide enough information so that the NLRB did not have to guess at or reconstruct Calvert's financial affairs itself.  Thus, the Court finds itself balancing the competing interests by deciding whether Calvert provided "*enough* information to ascertain the debtor's financial condition and track his financial dealings with *substantial* completeness and accuracy for a *reasonable* period past to present." *Juzwiak*, 89 F.3d at 427 (emphasis added).  The following two reasons tip the scale in Calvert's favor:

a.     A chapter 7 trustee is charged with investigating the financial affairs of a debtor (§ 704(a)(4)), and Trustee did so in Calvert's bankruptcy case.  Trustee conducted a § 341 meeting of creditors, filed a report of possible assets (Bankruptcy Case Docket No. 58), motions to sell (Bankruptcy Case Docket Nos. 69 and 128), and an application to employ an

auctioneer/realtor (Bankruptcy Case Docket No. 117). Trustee initiated an adversary proceeding against Kevin (*see* Finding of Fact ¶ 22(d)) for the purpose of recovering money transferred by Calvert to Kevin, and ultimately settled the adversary proceeding with Kevin agreeing to pay a substantial amount of money to the bankruptcy estate. Trustee represented to the Court that the settlement was fair, equitable and in the best interest of the bankruptcy estate and creditors, and the NLRB did not object to the proposed settlement.

       b.     Moreover, as the Court addressed at the conclusion of the trial, the Uniform Commercial Code anticipates the loss of negotiable instruments (for example, *see* Ind. Code § 26-1-3.1-309), so the loss of the original promissory notes is not, in and of itself, dispositive.

      21.     Based on the circumstances of Calvert's bankruptcy case, it appears that, notwithstanding the loss of the original promissory notes, Trustee was able to ascertain Calvert's financial condition or business transactions with Kevin and act thereon. *See Schaumburg Bank & Trust Co., N.A. v. Hartford (In re Hartford)*, 525 B.R. 895, 909 (Bankr. N.D. Ill. 2015) ("the failure [to keep accurate records] appeared to have no bearing on the trustee's ability to administer the bankruptcy case … [t]he trustee was able to conclude the section 341 meeting, issue a report of assets, set a bar date and take other steps to administer the case"). Therefore, strictly construing the exception to discharge against the NLRB, the Court declines to deny Calvert's discharge pursuant to § 727(a)(3).

§ 727(a)(4)

      22.     "The purpose of § 727(a)(4) is to enforce the Debtors' duty of disclosure and to ensure that the Debtors provide reliable information to those who have an interest in the

administration of the estate. *Stathopoulos v. Bostrom (In re Bostrom)*, 286 B.R. 352, 359 (Bankr. N.D. Ill. 2002) (citations omitted).

23.     In order to prevail, the NLRB must establish five elements:  "(1) [Calvert] made a statement under oath; (2) the statement was false; (3) [Calvert] knew the statement was false; (4) [Calvert] made the statement with the intent to deceive; and (5) the statement related materially to the bankruptcy case."  *Id.* (citation omitted).

> 24.     To find the requisite degree of fraudulent intent, the court must find that the debtor knowingly intended to defraud or engaged in such reckless behavior as to justify a finding of fraud.  Direct evidence of intent to defraud may not be available.  Instead, intent may be inferred from circumstantial evidence or by inference based on a course of conduct.  Reckless disregard means "not caring whether some representation is true or false ... ."  If a debtor's bankruptcy schedules reflect a "reckless indifference to the truth" then the plaintiff seeking denial of the discharge need not offer any further evidence of fraud.

*Trennepohl v. Neal (In re Neal),* 2009 WL 684793 at *2 (Bankr. S.D. Ind. 2009) (internal citations omitted).

25.     "[A] fact is material 'if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property.' "  *Stamat v. Neary*, 635 F.3d 974, 982 (7th Cir. 2011) (quotation omitted).

26.     The NLRB focuses on the omission of three items from Calvert's schedules and/or statement of financial affairs:  (a) the Account because it was held in his benefit, (b) a consulting business that he operated prior to the Petition Date, and (c) business income, particularly $10,000 he was paid within ten days or so of the Petition Date; and alleged false testimony at the § 341 meeting of creditors when Calvert testified that his only sources of income were rental income and social security.  *See* NLRB's Trial Brief, pp. 8-10.  Calvert denies that he had a consulting "business" and argues that the $10,000 spent pre-petition was not an asset on

the Petition Date.  With regard to the Account, he did not list it because it is his wife's account and she is not part of his bankruptcy case.

27.     The Court concludes that the NLRB has established elements (1), (2), and (5) with respect to each of the three omissions.

28.     However, the Court concludes that the NLRB has not established elements (3) and (4) by a preponderance of the evidence.

a.     Calvert clearly has, at minimum, an equitable interest in the Account.  He used it as his personal bank account even though his name was not on it.  The Account should have been scheduled.  However, his testimony undercuts the notion that the Account was omitted deceptively, and the NLRB has presented no evidence regarding Calvert's "reckless indifference to the truth" or a course of conduct that allows the Court to draw a different inference based thereon.

b.     Calvert's "consulting business" should have been disclosed.  The lack of formalities does not change its status as a "business," as sole proprietorships continue to be a valid and recognized business form.  Likewise, the $10,000 of income derived from Calvert's consulting business should have been disclosed in addition to the rental income and social security benefits he was receiving.  It is irrelevant that the income was inconsistent because it was earned through business-related activities.  However, the Court cannot conclude that Calvert had deceptive intent regarding the business or the $10,000 payment.  Calvert testified that he did not disclose the consulting business because it was not a "formal" business in his view, and that he did not disclose the $10,000 because it had been spent prior to the Petition Date.  The Court concludes that the NLRB did not meet its burden of proof because it presented no direct or circumstantial evidence that allows the Court to draw a different conclusion.

29.     The Court acknowledges that a common thread running through the omissions seems to be Calvert's reliance on "formalities" – e.g., his name was not on the Account; his wife was not a joint debtor in the bankruptcy case; he had not formally established a consulting business with the State of Indiana.  This common thread is not sufficient to establish a course of conduct that provides circumstantial evidence of Calvert's intent on its own.  The Court looked to substantiate this possible course of conduct through Calvert's "reckless indifference" to the truth or a lack of care about whether the schedules and statement of financial affairs were accurate, and it simply could not find substantiating evidence to conclude that Calvert's intent in omitting that information was to deceive.

30.     Therefore, because the Court finds that the omissions were not made "knowingly and fraudulently," the Court declines to deny Calvert's discharge pursuant to § 727(a)(4).

## Decision

Based on the foregoing, the Court hereby concludes that:

a.      Calvert is entitled to a judgment that the debt owed by Calvert to the NLRB is not excepted from discharge pursuant to § 523(a)(6); and

b.      Calvert is entitled to a judgment that Calvert's discharge will not be denied pursuant to § 727(a)(3) or (a)(4).

The Court will enter judgment consistent with these findings of fact and conclusions of law contemporaneously herewith.

# # #